691 A.2d 898

IN THE MATTER OF THE LIQUIDATION OF INTEGRITY INSURANCE COMPANY.

Superior Court of New Jersey
Chancery Division
Bergen County
General Equity Part

Argued September 19, 1996—Decided November 15, 1996.

*Thomas Novak; Steven S. Radin; Susanne K. Rosenzweig;* and *Michael Albano (Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross ),* for Liquidator of Integrity Insurance Company.

*Donald A. Klein (Winne, Banta, Rizzi, Hetherington & Basralian, P.C.),* for respondent Munich Reinsurance Company.

*David M. Spector (Mayer, Brown & Platt ),* for respondent Munich Reinsurance Company.

*Norman J. Golub* and *Jeffrey F. Leonard (Sheft & Golub & Kamlet ),* for respondent London Market Reinsurers.

*Debra Hall* for Reinsurance Association of America.

*James Stinson (Sidley & Austin )* for Reinsurance Association of America.

*Philip Rosenbach (Rosenbach & Rosenbach )* for Folksamerica.

*Christopher Barroll (McElroy, Deutsch & Mulvaney )* for Allstate, Resolute Reinsurance and Scandia America Group.

MEEHAN, P.J.S.C.

Integrity Insurance Company was a New Jersey stock insurance company that issued various types of insurance policies as well as surety bonds. This court declared Integrity insolvent by Order of Liquidation dated March 24, 1987, under Section 6 of the New Jersey Insurer Liquidation Act, *N.J.S.A.* 17:30C (hereinafter the "Act") and the Commissioner of Insurance was appointed

Liquidator. Pursuant to procedures established in *N.J.S.A.* 17:30C–20 and implemented by Order dated July 8, 1987, approximately 26,000 claims were filed against the Integrity estate in liquidation (hereinafter "Integrity" or the "Estate"), of which an estimated 856 arose from surety bonds written by Integrity. The court then assigned Special Masters to hear and recommend allowances of these claims.

It is important to note that many of Integrity's excess and umbrella insurance policies are not typically triggered until exhaustion of underlying coverages. Further, the nature of many of these losses are related to environmental contamination and product liability. Thus, there will be a long delay in reporting these claims to Integrity and the various reinsurers. To the extent these losses have not yet been reported, they are known as incurred but not yet known or reported losses (hereinafter "IBNKR"). In addition, there are losses which have been reported but not yet reduced to judgment or settlement. These losses are referred to as case reserves.

The Commissioner of Insurance, acting in her capacity as Liquidator of the Estate, brought this motion to establish procedures for court approval of a final plan for distribution of the Integrity assets. However, before this court can approve any proposed plan, a threshold issue of statutory interpretation must be resolved. The precise issue presented to this court is whether the Liquidator has the legal authority to estimate the value of IBNKR losses and reported case reserves in order to allow such contingent claims to participate in the final distribution of assets. If so, contingent claims of third parties and policyholders are entitled to the fourth priority of distribution of assets, rather than being excluded entirely from the final distribution of assets. The statute provides that the priority of distribution in a liquidation proceeding is as follows:

(1) Expenses of administration;

(2) Compensation of employees as provided in subsection (a) of this section;

(3) Claims for taxes and debts due to Federal or any state or local government which are secured by liens perfected prior to the commencement of delinquency proceedings;

(4) Claims by policyholders, beneficiaries and insurers arising from and within the coverage of and not in excess of the applicable limits of insurance policies and insurance contracts issued by the company and liability claims against insurers which claims are within the coverage of and not in excess of the applicable limits of insurance policies and insurance contracts issued by the company and claims presented by the New Jersey Property–Liability Insurance Guaranty Association and claims presented by any similar organization in another state;

(5) All other claims.

[*N.J.S.A.* 17:30C–26(c).]

The significance of this issue is illustrated by the fact that there are approximately $349 million in outstanding case reserves, *i.e.* pending claims that have not yet been resolved. Furthermore, there are an estimated $1.321 billion of IBNKR losses as of December 31, 1995, which may not become absolute as to liability, coverage, and amount for thirty years or more. Pursuant to the plan, Integrity's reinsurers will be obligated to pay on these contingent claims an estimated $876 million. The Liquidator would then utilize this additional source of assets to pay distributions to policyholders and claimants.

I

The Liquidator has outlined three possible options with respect to the conclusion of Integrity's liquidation. The first option involves a run-off approach and continuing the liquidation until all or substantially all contingent claims become absolute as to value and amount. This option, the Liquidator argues, would result in continuing the liquidation for at least another 10 years (likely longer), thereby delaying the full final dividend to claimants and policyholders, and causing the Estate to incur administrative expenses over the next 10 years of approximately $45 million.

The second option involves a cut-off approach whereby the Estate's liability for any IBNKR losses would be terminated. The Liquidator argues that this approach would be manifestly unfair to many policyholders and third parties with contingent claims who

would lose any recourse to the assets of Integrity's Estate. Further, this approach would have a serious impact on the insurance-consuming public because many of the contingent claims would be paid, in part or in full, by state insurance guaranty associations (hereinafter "IGAs"). If the Estate avoids implementing a cut-off plan, the IGAs would have recourse to Integrity's assets, including reinsurance assets marshaled by the Liquidator. If, however, all contingent claims are terminated and reinsurance not collected, the IGAs would lose this source of funding and would have to recoup their claim payments exclusively through assessments on member insurers. The member insurers, in turn, would levy surcharges on purchasers of insurance policies to recoup the assessments.

The third alternative, which is outlined in the Liquidator's Final Dividend Plan, proposes to estimate and, in appropriate cases, allow contingent claims at their net present value using an independent actuarial consulting firm, and collect any reinsurance that may be due on the claims. The Liquidator contends that such an approach will: (1) protect the interests of claimants with contingent claims, (2) abbreviate the delay in making final payment to claimants, (3) maximize the assets of the Estate, (4) reduce administrative expenses, and (5) lighten the burden of Integrity's insolvency on the IGAs and the insurance-consuming public. If such a plan is implemented, the Liquidator hopes to conclude the liquidation of Integrity's Estate within three years.

The respondents in this matter object to the Liquidator's proposed Final Dividend Plan on the grounds that the proposal rests, not on the express provisions of New Jersey's insurance statutes, but instead on a series of sweeping assertions by the Liquidator. In support of its objection, the respondents contend that historically virtually all insurer insolvencies have been resolved on the basis of specific, individual claims for known, verifiable losses. This approach, the respondents claim, is explicitly contemplated by *N.J.S.A.* 17:30C–28(a).

## II

Determining which claims against an insolvent insurer may participate in the final distribution of assets is a critical stage in the administration of the Estate. *See N.J.S.A.* 17:30C–20. When contingent claims are at issue, a supervising court must look to *N.J.S.A.* 17:30C–28 for guidance. In particular, *N.J.S.A.* 17:30C–28a provides:

> a.  No contingent claim shall share in a distribution of the assets of an insurer . . . except that such claims shall be considered, if properly presented, and may be allowed to share where
>
> (1) Such claim becomes absolute against the insurer on or before the last day fixed for filing of proofs of claim against the assets of such insurer. . . .[1]

The statute, however, carves out a different rule in *N.J.S.A.* 17:30C–28b for third party claimants who have a cause of action against the insured of an insolvent insurer. This subsection provides as follows:

> b.  Where an insurer has been so adjudicated to be insolvent, any person who has a cause of action against an insured of such insurer, shall have the right to file a claim in the liquidation proceeding, regardless of the fact that such claim may be contingent, and such claim may be allowed
>
> (1) If it may be reasonably inferred from the proof presented upon such claim that such person would be able to obtain a judgment upon such cause of action against such insured; and
>
> (2) If such person shall furnish suitable proof, unless the court, for good cause shown, shall otherwise direct, that no further valid claims against such insurer arising out of his cause of action, other than those already presented, can be made; and
>
> (3) If the total liability of such insurer to all claimants arising out of the same act of its insured shall be no greater than its maximum liability would be, were it not in liquidation.

---

[1] The Liquidation Order of March 24, 1987 set the date of March 25, 1988, by which claims had to have been filed with the Liquidator. This date, however, is not the last day fixed for the filing of proofs of claims as provided in *N.J.S.A.* 17:30C–28, because the Liquidation Order permitted policyholders who did not know of actual or potential claims against them as of March 25, 1988, to "reserve [their] rights to assert all future claims against Integrity. . . ." Liquidation Order at 14–15.

Unfortunately, no court in our state has had the opportunity to decide whether the Liquidator, or even the supervising court, has the statutory authority under *N.J.S.A.* 17:30C–28 to estimate the value of IBNKR losses on behalf of policyholders in order to allow such claims to share in the final distribution of assets. Considering the dearth of cases under the Act, this court has found pre-Act decisions to be particularly instructive on this delicate issue.

### III

In the pre-Act era, there were only a few courts that dealt with the issue of allowance of contingent claims. Most of the decisions demonstrate, however, a willingness according to general principles of equity to permit estimation and allowance of contingent claims. In *In re Citizens Title Insurance & Mortgage Co.*, 127 *N.J.Eq.* 551, 15 *A.*2d 57 (Ch.1940), a loan corporation that had purchased 112 title insurance policies from a title insurer that subsequently was declared insolvent, sought to recover a statutory deposit that the insurer had originally placed with the Department of Banking and Insurance as a condition to writing title insurance. No losses covered by the policies had yet occurred, but the loan corporation contended that although its claims were contingent, the deposit should not be used to pay other creditors. *Id.* at 552, 15 *A.*2d 57. Rather, the loan corporation proposed either that it be paid for the cost of finding replacement insurance, or that the deposit remain intact should there be future claims by it. *Id.*

The trustee in liquidation maintained that the contingent status of the loan corporation's claims entitled it to nothing from the estate. The court, however, disagreed, stating:

> It would, however, be clearly unjust and improper to indefinitely tie up the statutory deposit while waiting for such claims to mature. The rule of practicality and convenience requires that in cases such as this, the claims be disposed of once and for all.... The principle of making provision for contingent claims, instead of completely wiping them out by distribution of all assets, has been recognized as a principle of equity....

*Id.* at 554, 15 *A.*2d 57. Consequently, the court held that the loan corporation's contingent claims would be allowed in an amount up

to the cost of acquiring replacement insurance and the corporation would share *pro rata* with holders of other valid claims. *Id.* *See also Aetna Casualty and Surety Company v. International Re-Insurance Corporation,* 117 *N.J.Eq.* 190, 199, 175 *A.* 114 (Ch. 1934), and *Beatty v. Paterson–Garfield–Lodi Bus Company,* 126 *N.J.Eq.* 472, 475, 9 *A.*2d 686 (Ch.1939). More importantly for our purposes, the court noted that it also had the equitable power to estimate or to fix the amount of the contingent claim for purposes of allowance on the presentation of further facts. *In re Citizens Title Insurance & Mortgage Co.,* 127 *N.J.Eq.* at 554, 15 *A.*2d 57.

In *American Lead Pencil Co. v. N.J. Title Guarantee & Trust, Co.,* 130 *N.J.Eq.* 148, 21 *A.*2d 341 (Ch.1941), *aff'd,* 131 *N.J.Eq.* 473, 24 *A.*2d 849 (E. & A.1942), the insureds of a title insurance company in liquidation filed proofs of claim with the Commissioner of Banking and Insurance, the appointed liquidator. The Commissioner rejected the claims as contingent, because no loss had been sustained by the insureds and there was no evidence that the contingency insured against had occurred.

In reversing the decision of the Commissioner, the court reasoned that "the equitable rule that equity will protect the rights of those holding a contingent claim [will be enforced] whenever it is possible to do so without substantial detriment to the right of other creditors." *Id.* at 151, 21 *A.*2d 341. The court stated that this principle was "consistent with equity and good conscience," *Id.* at 150, 21 *A.*2d 341, and held that insureds "will be permitted to file claims as general creditors for the cost of reinsurance against the general assets of the defendant [insurer]." *Id.* at 151, 21 *A.*2d 341.

## IV

The current practice under Section 502(c) of the Federal Bankruptcy Code [2] (hereinafter the "Code") also provides this court with helpful guidance in dealing with the contingent claim issue.

---

[2] 11 *U.S.C.A.* § 502(c).

According to this section of the Code, contingent claims must be estimated for purpose of allowance if such a claim, the fixing or liquidation of which, would unduly delay the administration of the case.

In *Katchen v. Landy,* 382 *U.S.* 323, 328–29, 86 *S.Ct.* 467, 471–72, 15 *L.Ed.*2d 391 (1966), the Supreme Court observed that it had "long recognized that a chief purpose of the bankruptcy laws is 'to secure a prompt and effectual administration of all bankrupts within a limited period,'" and that provision for summary determination of claims "'without regard to usual methods of trial attended by some necessary delay,' is one of the means chosen by Congress to effectuate that purpose." (Citations omitted) Section 502(c) codified this purpose by requiring that all claims be converted into dollar amounts. H.R. No. 95–595, 95th Cong., 1st Sess. 354 (1977), 1978 U.S.Code Cong. & Admin.News, p. 6310; S.Rep. No. 95–989, 95th Cong., 2d Sess. 65 (1978), 1978 U.S.Code Cong. & Admin.News, pp. 5787, 5851.

The Bankruptcy Code and Rules were designed to implement a speedy, efficient, and economical method for the determination and allowance of claims. Based on this policy, it is clear that Congress intended that contingent or unliquidated claims be estimated by the bankruptcy judges under section 502(c), using whatever method is best suited to the particular contingencies at issue. *Bittner v. Borne Chemical Co., Inc.,* 691 *F.*2d 134, 135 (3d Cir.1982). The language of Section 502(c) is mandatory, not permissive, and imposes upon the court an affirmative duty to estimate any unliquidated or contingent claim where the actual liquidation of the claim would unduly delay the administration of the case. *In re Nova Real Estate Investment Trust,* 23 *B.R.* 62, 65, 7 *C.B.C.*2d 87 (Bkrtcy.E.D.Va.1982). The bankruptcy court simply values and "estimates the amount of the claim for purposes of its allowance ... discounting its value to reflect the uncertainty of the contingency, in order to enable the holder to share in the distribution of the insolvent estate." *In re Hemingway Transport, Inc.,* 993 *F.*2d 915, 923 (1st Cir.1993).

In a Chapter 7 liquidation case, the courts do not have the luxury of an ongoing business to pay contingent claims when finally liquidated, as they do in a rehabilitation case. Thus, waiting for contingent claims to mature in liquidation cases would unduly delay the administration of the case. Consequently, a bankruptcy court has to determine some basis upon which to base an estimate of the amount of the claim. This task must be accomplished as it is mandated by the Code, the goals of which are (1) to promote a fair distribution to creditors through a realistic assessment of uncertain claims, and (2) to avoid the need to await the resolution of pending or future outside lawsuits to determine issues of liability or amounts owed by means of anticipating and estimating the likely outcome of these actions. *Matter of Ford,* 967 *F.*2d 1047 (5th Cir.1992).

## V

The Commissioner of Insurance, as the court-appointed Liquidator of Integrity, has the authority under both the Act and the Integrity Liquidation Order to "do all acts necessary or appropriate for the accomplishment of the liquidation of Integrity." Liquidation Order, p. 3. The powers of the Commissioner as Liquidator have also been confirmed in case law directly related to this liquidation. "The statutory function of the Commissioner and/or the deputy liquidator is to weigh all the interests and to perform an efficient and fair liquidation of Integrity." *In re Liquidation of Integrity Ins.,* 231 *N.J.Super.* 152, 157, 555 *A.*2d 50 (Ch. Div.1988).

It is also important to note that a supervising court has broad equitable powers pursuant to *N.J.S.A.* 17:30C–4d, which provides that the court may grant:

such ... relief as the nature of the case and the interests of the policyholders, creditors, stockholders, members, subscribers or the public may require.

This wide discretion was also confirmed by the Appellate Division, when it expressly stated that *N.J.S.A.* 17:30C–4d allows "the court ... to fashion any relief which 'may' be necessary to protect their interests, as well as that of 'the public.'" *Matter of Integrity Ins.*

*Co.*, 240 *N.J.Super.* 480, 490, 573 *A.*2d 928 (App.Div.1990). Moreover, the Appellate Division further stated that "a supervising court is statutorily required to exercise a wide range of discretion in order to protect such interests." *Id.* at 491, 573 *A.*2d 928. In order to properly protect these interests, *N.J.S.A.* 17:30C–5(b) provides that the court may issue such "orders as may be deemed necessary to prevent interference with the commissioner … or waste of the assets of the insurer...."

Of particular relevance to the issue before this court is the Appellate Division's instructions on how a supervising court should interpret the provisions of *N.J.S.A.* 17:30C. The Appellate Division stated that "[a]ny interpretation of both our Act and the Uniform Act must be influenced by the provisions which mandate that the broadest protection be afforded to the public and the various claimants and beneficiaries." *Matter of Integrity Ins. Co.*, 240 *N.J.Super.* at 491, 573 *A.*2d 928. *See also Purdy v. Nationwide Mut. Ins. Co.*, 184 *N.J.Super.* 123, 445 *A.*2d 424 (App.Div. 1982). Consequently, this court will interpret the provisions of the Act dealing with the allowance of contingent claims with a view towards affording the public and the various claimants the broadest protection possible.

## VI

Based on the provisions of *N.J.S.A.* 17:30C, public policy concerns, pre-Act case law, the Federal Bankruptcy Code and case law applying its provisions, as well as the generally broad equitable authority granted to both a Liquidator and a supervising court, this court finds that the Liquidator has the legal authority to: (1) estimate the net present value of IBNKR losses and pending case reserves on behalf of future claimants as a class,[3] and (2) allow such contingent claims to participate in the final distribution of Integrity's assets.

---

[3] This class includes third party claimants as well as policyholders who have contingent losses.

## A.

As discussed above, the Act treats policyholders and third parties differently with respect to contingent claims. In pertinent part, the Act provides that no contingent claim may share in a distribution of assets unless such claim becomes *absolute* against the insurer on or before the last day fixed for filing proofs of claim against the assets of such insurer. *See N.J.S.A.* 17:30C–28a(1). This provision generally applies to all contingent claimants of the estate. Thus, for policyholders with contingent losses to participate in a distribution of assets, their claims must become absolute before the claims bar date.

It is crucial to note, however, that this court permitted policyholders who did not know of actual or potential claims against them as of March 25, 1988, to "reserve [their] rights to assert all future claims against Integrity...." Liquidation Order at 14–15. In so ruling, this court acknowledged that many of the IBNKR losses sustained by policyholders are directly related to environmental and product liabilities that may not be detected for many years. This ruling is especially significant when analyzing the applicability of *N.J.S.A.* 17:30C–28a(1) to this case. It is clear from the express language of this subsection that contingent claims must become absolute on or before the claims bar date or they are excluded from sharing in the distribution of assets. In other words, the statute appears to arbitrarily eliminate contingent claims if they have not become absolute by the claims bar date.

The facts before this court present a different situation. On March 24, 1987, this court opted not to eliminate the contingent claims of policyholders by exempting this class from the filing deadline of March 25, 1988. In so ordering, this court preserved the actual or potential claims of policyholders by permitting them to reserve their rights to assert *all future claims* against Integrity. Consequently, such claims did not have to become absolute on or before March 25, 1988, to be allowed; however, such claims can only participate in the distribution of assets "if properly present-

ed" to this court. *See N.J.S.A.* 17:30C–28a. The ultimate questions to be answered then are: (1) whether this court, as supervisor, can permit the Liquidator to present contingent claims to the court on behalf of future claimants as a class, and (2) whether this procedure is considered proper presentment.

### B.

Before the court can address these issues, it must focus on the statutory procedures for allowing contingent claims of *third parties* to share in the assets of the Estate. As stated earlier, the Act carves out a different rule with respect to third parties. Pursuant to *N.J.S.A.* 17:30C–28b, "any person who has a cause of action against an insured ... shall have the right to file a claim ... regardless of the fact that such claim may be contingent, and such claim may be allowed ... if it may be reasonably inferred from the proof presented.... that such person would be able to obtain a judgment upon such cause of action against such insured."

Again, this subsection attempts to eliminate third party contingent claims only if it cannot be reasonably proven that such a claim will be reduced to judgment. This is clearly an onerous burden to satisfy, especially since many third parties with environmental and product liability claims against an insured may have no knowledge of their future losses, and may not discover them until long after the triggering event (the actual spilling of toxic pollutants, for example) and expiration of the policy. Thus, any injuries caused may take several years to surface.

In this situation, it would be manifestly unjust for any future claimant in this situation to be saddled with the costly burdens of these losses without any recourse against the Integrity Estate. Therefore, if the court excluded all contingent claims of third parties from the final distribution of assets, it would be against the interests of the public. *See Matter of Integrity Ins. Co.,* 240 *N.J.Super.* at 491, 573 *A.*2d 928. In fact, such a course of action could prove to be disastrous to many unsuspecting persons who have no recourse against the Estate for their losses. Of course,

third party claimants, or any future claimant, may have recourse in part or in full against the state-funded IGAs; however, the insurance consuming public, as a whole, will be seriously injured if the court adopts this approach.

For instance, if the Liquidator allows contingent claims to participate, the IGAs would have recourse to Integrity's assets, including reinsurance assets marshaled by the Liquidator. If, however, all contingent claims were terminated and reinsurance not collected, the IGAs would lose this source of funding and would have to recoup their claim payments exclusively through assessments on member insurers. The member insurers, in turn, would levy surcharges on purchasers of insurance policies to recoup the assessments.

The other alternative, the run-off approach, is not appropriate either. If the Liquidator waits for final disposition of these future claims, it would unduly delay the closing and administration of the liquidation proceeding, which is already over 10 years old. In fact, as the Liquidator notes, this approach would result in (1) increased administrative expenses (up to $45 million), (2) a delay in payment to claimants, and (3) further decrease the value of the Integrity Estate. Such a plan would clearly waste Integrity's assets.

## C.

Considering the overwhelming interests of the public and the enormous amount of contingent losses currently outstanding, this court will exercise its broad equitable power under *N.J.S.A.* 17:30C–4d and *N.J.S.A.* 17:30C–5b to authorize the Liquidator to properly present contingent claims to this court on behalf of future claimants.[4] *See Matter of Integrity Ins. Co.*, 240 *N.J.Su-*

---

[4] *N.J.S.A.* 17:30C–20a provides in pertinent part that "[a]ll claims against an insurer ... shall set forth in reasonable detail the amount of the claim, or the basis upon which such amount can be ascertained, the facts upon which the claim is based, and the priorities asserted, if any. All such claims shall be

*per.* at 490, 573 *A.*2d 928. This decision will permit the Liquidator to estimate the value of IBNKR losses in order to allow such contingent claims to participate in the final distribution of assets. This decision is necessary to protect the interests of the policyholders, creditors, as well as that of the general public. In addition, it is necessary to prevent both interference with the Liquidator's final dividend plan by the respondents and the clear waste of Integrity's assets. *See N.J.S.A.* 17:30C–5b.

The court's decision in this matter is appropriate and within the scope of its authority because it provides the broadest protection to the public, as well as to the various claimants and beneficiaries. *Matter of Integrity Ins. Co.,* 240 *N.J.Super.* at 491, 573 *A.*2d 928. Also, the court's holding is supported by the fact that the Liquidator is charged with the duty of protecting and representing fairly and efficiently the interests of all parties to the liquidation, *In re Liquidation of Integrity Ins.,* 231 *N.J.Super.* at 157, 555 *A.*2d 50, and in this case, the Liquidator has determined that the most efficient and fair distribution plan should include contingent claims, particularly because the losses on these claims are over $1.6 billion. Thus, this court will permit the Liquidator to present proof upon such contingent losses on behalf of these future unknown claimants, provided that the objective is to maximize the assets of the Estate of Integrity to which the public may look for satisfaction of their debt.

Reinsurers will be required to pay once the Liquidator allows a contingent claim, so that contingent debts may be paid by the Liquidator.[5]

---

verified by the affidavit of the claimant, *or someone authorized to act on his behalf* and having knowledge of the facts, and shall be supported by such documents as may be material thereto." (emphasis added)

[5] The Bankruptcy Court in *In re Johns–Manville Corp.,* 36 *B.R.* 727 (Bankr. S.D.N.Y.1984), *appeal denied,* 39 *B.R.* 234 (S.D.N.Y.1984) and 36 *B.R.* 743 (Bankr.S.D.N.Y.1984), adopted a trust fund approach. In the *Manville* case, the court appointed a lawyer to represent unknown claimants who may have future injuries from the effects of asbestosis. The lawyer negotiated on behalf of the

This approach is entirely consistent with the goals and purposes of our Act. It will promote a fair distribution to claimants through a realistic assessment of uncertain and unknown claims. Most importantly, however, the interest of the public will be protected. By allowing contingent claims to participate in the final distribution of assets, Integrity's reinsurers will have to pay on these claims an estimated $876 million; consequently, it will maximize the overall asset value of the Integrity estate.

Just as the Liquidator may prosecute a claim on behalf of creditors, policyholders and the public, in order to maximize the wealth of the estate, *In re Liquidation of Integrity Ins.*, 231 *N.J.Super.* at 157, 555 *A.2d* 50, the Liquidator may present proof of these contingent claims to the court on behalf of these same parties, and allow these future claims to share in the final distribution of assets. By authorizing the Liquidator to estimate and allow these claims, it will abbreviate the delay in making final payment to claimants, maximize the assets of the Estate, reduce administrative expenses, and lighten the burden of Integrity's insolvency on the IGAs and the insurance-consuming public. The reinsurers and others will have the opportunity to contest whether a claim is subject to estimation, what the value of the claim is, and other issues that may arise that are not covered in this matter. Therefore, the court determines that the Liquidator has the statutory authority to determine contingent claims and to permit such contingent claims to participate in distributing of assets from the Estate.

---

claimants and ultimately there was an agreement under which specific parts of the assets of the company would be put into a trust and ultimately paid out to the future claimants. This court is not now adopting that procedure at this time.